SHEILA ROACH *et al.*, as Parents and Next Friends of Their Minor Daughter, Kayla Roach, Plaintiffs-Appellants, v. SPRINGFIELD CLINIC *et al.*, Defendants-Appellees.

Fourth District No. 4—91—0103

Opinion filed December 13, 1991.—Rehearing denied February 20, 1992.

Alexandra de Saint Phalle, of Londrigan, Potter & Randle, P.C., of Springfield, for appellants.

Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville, Gary M. Peplow, of Heyl, Royster, Voelker & Allen, of Peoria, and Adrian E. Harless, of Heyl, Royster, Voelker & Allen, of Springfield (James E. Neville and Karen E. Mason, of counsel), for appellee Springfield Clinic.

Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville (James E. Neville and Karen E. Mason, of counsel), for appellee E. Michael Bradley.

Paul Brown and Denise M. Druhot, both of Brown, Hay & Stephens, of Springfield, for appellee Memorial Medical Center.

Gary M. Peplow, of Heyl, Royster, Voelker & Allen, of Peoria, and Adrian E. Harless, of Heyl, Royster, Voelker & Allen, of Springfield, for appellee Michael Zinzilieta.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On February 6, 1988, plaintiffs Sheila and Timothy Roach, as parents and next friends of their minor daughter Kayla Roach, filed suit in the circuit court of Sangamon County against defendants Springfield Clinic (Clinic), Memorial Medical Center (Memorial), Michael Zinzilieta, M.D., and E. Michael Bradley, M.D. The complaint sought compensatory damages for injuries to the minor and alleged these injuries resulted from medical malpractice by the various defendants. After a jury trial, the court entered judgment in October 1990 on a verdict in favor of all defendants and against plaintiffs. Plaintiffs have appealed requesting a new trial. We affirm.

The case was tried on plaintiffs' third-amended complaint, which alleged that the malpractice occurred while defendants were providing medical services in connection with the birth of the minor child to her mother, plaintiff Sheila Roach, on January 11, 1987. After trial, plaintiffs were permitted to file a fourth-amended complaint

which alleged, *inter alia,* (1) defendants were negligent in failing to perform a cesarian section (C-section) earlier in the delivery of the minor plaintiff; (2) defendants were negligent, once the decision to perform a C-section was made, in not performing the operation more quickly; (3) as a result of defendants' negligence, the minor plaintiff suffered severe brain damage and has permanent brain injury and cerebral palsy.

On appeal, plaintiffs maintain the court erred in (1) excluding evidence; (2) instructing the jury; and (3) denying a new trial when, after trial, an affidavit was presented stating that one of the jurors was the spouse of a patient of defendant Dr. Zinzilieta. Plaintiffs also maintain cumulative error and discovery violations by defendants require a new trial. Plaintiffs do not contend that the strength of the evidence requires a judgment in their favor, but the following summary of the evidence is necessary for understanding of the issues raised.

Defendant Dr. Edward Bradley testified at trial that (1) he was a member of the Clinic and the obstetrician for plaintiff Sheila Roach for the birth of Kayla Roach; (2) she had no problems with her pregnancy, at least through January 5, 1987; (3) the fetus had normal fetal heart tones at each of the prenatal visits conducted by Dr. Bradley; (4) when Dr. Bradley saw Sheila on January 5, she was six days beyond her due date of December 31, 1986; (5) Dr. Bradley scheduled Sheila to have a "non-stress test" on January 10, 1987, to determine the baby's status; (6) Sheila did not deliver by the 10th and entered Memorial for that test; (7) a resident, Dr. Kintner, performed the non-stress test as well as a sonogram and vaginal exam and determined there was "decreased fetal movement [and] that the non-stress test was non-reactive" which meant a "potential" for fetal distress; and (8) based on the test results, Bradley decided to admit Sheila to the hospital and attempt to deliver her vaginally, with continuous fetal monitoring, by the use of pitocin to induce uterine contractions. Dr. Bradley described the "non-stress test" as a monitoring of the fetal heart beat while the mother was not under physical stress.

Dr. Bradley further testified that (1) throughout the time the pitocin was administered to induce delivery, Sheila was monitored with use of continuous electronic fetal monitor and assessment by nursing personnel and residents; (2) at 12:30 p.m. on January 10, 1987, he reviewed the fetal monitor strips, determined no signs of fetal distress existed, and continued the plan of vaginal delivery induced with pitocin; (3) at approximately 6 p.m. on January 10,

Bradley spoke with Kintner and was advised that Sheila continued to have contractions, that there were intermittent periods of increased and decreased fetal heart rate variability, but there were no signs of fetal distress; (4) he then decided to continue inducing with pitocin until 8 p.m., when it would be discontinued to allow Sheila to eat and sleep for the evening and resume inducing her the following morning; (5) after the pitocin was stopped, Bradley was advised by Kintner that Sheila was continuing to have contractions, and there were no signs of fetal distress; and (6) Bradley was not advised of any problems throughout the night or morning of January 11, 1987, and his involvement with her treatment ended at 8 a.m. on January 11.

Defendant Dr. Zinzilieta was also shown to be a member of the Clinic and an obstetrician. Evidence also showed he took over the treatment of Sheila Roach at 8 a.m. on January 11, 1987, and, at that time, spoke with Dr. Putnam, the obstetrical resident who had then assumed the responsibility to Mrs. Roach previously undertaken by Dr. Kintner. Dr. Zinzilieta testified that at that time he reviewed the nurses' notes, physicians' notes, and the fetal monitor strips generated that morning, as well as those recorded the previous day, he determined that Drs. Bradley and Kintner's assessment of no fetal distress was correct, and decided to continue inducing the labor. He testified he performed a vaginal examination of Mrs. Roach and concluded she was making progress and was going into the active phase of labor.

Dr. Zinzilieta further testified that during his vaginal examination, he felt an irregular structure above the cervix which might have been a hand or possibly a breach presentation. He said he was able to determine the structure was not the umbilical cord. He said he recognized the *potential* for a prolapsed cord (a prolapsed cord occurs when the umbilical cord drops below the baby's head into the birth canal and cuts off all oxygen supplied to the baby as the baby comes through the vagina). Dr. Zinzilieta said he performed a sonogram and was able to rule out a hand or breach presentation.

Dr. Zinzilieta testified that after completing his examination, he discussed the management plan with Dr. Putnam, apprised Memorial of the potential for an emergency C-section, if increased fetal distress were noted or if a prolapsed cord became evident. He testified that he personally instructed Memorial nurses to prepare for a C-section and to alert the anesthesia department in case they were needed in an emergency situation. He stated he then left Memorial hospital at 10 a.m. to conduct rounds at St. John's Hospital. Dr.

Zinzilieta said he did not perform a C-section at that time, because there were no indications that a C-section was the right thing to do for Sheila Roach or her baby. Helen Sponsler, who was one of two nurses caring for Sheila Roach, testified she was not informed to be prepared for a C-section at the time to which Dr. Zinzilieta referred.

The evidence was also undisputed that at 11:30 a.m. the baby's heart rate suddenly dropped below normal. The labor chart indicated Kayla's heart rate dropped from 140 beats per minute to 120 and then to 70 beats in less than three minutes. At 11:33 a.m. the heart rate dropped to 50 beats per minute and Dr. Putnam, the resident on duty, was called. By 11:35 Putnam was present and examining Sheila. He testified that a heart rate of 60 to 70 beats per minute or less would cause the baby to sustain brain damage within 10 minutes.

The hospital chart indicated that at 11:35 a.m. Zinzilieta, the anesthesia department, and the anesthesiologist, Dr. Gotanco, were called. Nurse Sponsler testified the times were approximate, since they were reconstructed after the child's birth at 11:51 a.m. The chart further indicates the baby's last audible heart beat was heard at 11:37 a.m., and at 11:38, Putnam took Sheila Roach to the operating room. Dr. Zinzilieta arrived in the C-section room at approximately 11:44. He said that upon his arrival in the C-section room, preparations for the C-section were in progress and the first surgical incision was made at 11:47 a.m. The anesthesiologist and nurse anesthetist had not been notified at this time and Dr. Zinzilieta proceeded under local anesthetic. Kayla was delivered at 11:51 a.m. with the umbilical cord wrapped so tightly around her neck that it had to be clamped and cut rather than unwrapped.

Dr. Gotanco and nurse anesthetist Mike Funk testified that they did not receive the initial call at 11:35 a.m., although Dr. Gotanco was in the call room equipped with an emergency pager and Mike Funk was in the anesthesia lounge reading a newspaper. Both testified that they had not been forewarned of the potential emergency. Funk testified that he received notice at approximately 11:47 a.m. and arrived in the operating room at 11:50.

Dr. Kozak, Kayla Roach's pediatrician, testified that at birth, the infant was not breathing, there was no heart tone, and the baby was "next to being dead." Resuscitation efforts were begun. Five minutes elapsed before a heart rate of 20 to 30 beats per minute was obtained, and a normal heart rate was first reached at 10 minutes of age.

A child neurologist, Michael Noetzel, called by plaintiffs, testified Kayla has cerebral palsy and brain damage which is permanent. Dr. Noetzel stated that, in his opinion, Kayla's palsy and brain damage resulted from a lack of oxygen just before birth. Various doctors testified on behalf of the defendants, giving opinions indicating no malpractice occurred.

Most of plaintiffs' proof of malpractice by the two obstetricians came from the testimony of Dr. Stuart Weiner, an obstetrician and gynecologist called by plaintiffs. He described Memorial hospital as a facility equipped and staffed to handle any type of pregnancy complication. He agreed with testimony by the defendant doctors that the American College of Obstetricians and Gynecology standards for a facility of this nature included a "minimum start up time" of 30 minutes or less for proceeding with an emergency C-section but further testified that those standards required, in a case where the anesthesiologist and physician are available in-house, that a C-section should be started in "a matter of minutes, at most five to ten" minutes. Weiner also testified that the risk to the mother is minimal when a C-section is performed.

Dr. Weiner noted that Sheila Roach had entered the hospital on January 10 after having noted a decrease in fetal movement since 9 p.m. the previous evening. He stated this lack of fetal movement merely indicated the possibility of a problem. Dr. Weiner expressed an opinion that further testing should have been done before starting to induce labor and during the time pitocin, the labor-inducing drug, was being given. Based upon his examination of the strip registering the fetal monitoring on January 10, he expressed an opinion that the situation was "worrisome" enough that a C-section should have been performed that day. However, he admitted on cross-examination that based on the information available on January 10, the professional standards he had previously referred to would not have required the performance of a C-section. Weiner further stated that, in his opinion, the delay in performing the C-section contributed to the baby's bad condition but he could not tell when the neurologic damage occurred by examining the fetal monitoring strip.

Dr. Weiner further testified on cross-examination that he did not believe the cord tightening around the baby's neck was the cause of the injury to the baby. Rather, he concluded, the damage was caused by the baby being so far overdue that the placenta was insufficient to support the fetus. On redirect examination, Weiner stated that the standard time for performing a C-section at a hospi-

tal such as Memorial is 15 to 20 minutes from the time the decision to do so is made until delivery, but here the C-section should have been performed more rapidly because defendants were aware of potential problems long before the final drop in the fetal heart rate.

As far as plaintiffs' case against Memorial is concerned, plaintiffs' most serious claim of error arises from the circuit court's sustaining an objection to a question asked by plaintiffs of Michael Funk, a nurse anesthetist for Memorial who participated in the delivery. In order to understand the significance of these rulings, consideration of the testimony of Connie McLean, a registered nurse for Memorial who was working in the labor and delivery department at Memorial at the time of the C-section, is required. She testified she then had been working in that department for only three months and was in a period of "orientation." She further stated that at approximately 11:30 a.m. on January 11, she noticed that a monitor indicated fetal heart times in a patient awaiting delivery had decreased and that two nurses went into the room and then came out pushing a bed with a patient on it. McLean stated the nurses requested her "to call Dr. Zinzilieta and anesthesia."

McLean testified that upon receiving the above instructions, she had Zinzilieta paged and then called a number for the anesthesia room but got no answer, so she paged Dr. Gotanco, the anesthetist on call. She stated that when she got no response "[a]nesthesia was paged overhead" and then someone made her aware that an "anesthetist was in the room," so she stopped calling. On cross-examination, McLean testified she never had any "run through" as to how to respond when an emergency C-section was required. She also testified nobody had talked to her earlier that day in regard to an emergency C-section occurring.

Prior to McLean's testimony, Funk had been called by plaintiffs under section 2—1101 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1989, ch. 110, par. 2—1101) to testify as if under cross-examination. He stated that prior to 11:47 a.m. on January 11, 1987, he received no warning of the possible need of Sheila Roach for a C-section and was first advised of that emergency by a phone call while he was sitting in anesthesia's combination workroom-lounge, where he would be expected to be when not "performing a procedure." He stated he did not take the call himself. He explained that when he arrived in the operating room, surgery was in progress and the patient was conscious. He gave her a general anesthetic, and in about 1½ minutes, the baby was delivered. Plaintiffs' counsel then asked Funk if he had ever been told by Dr. Dra-

per, Memorial's chief of anesthesia, why the delay occurred in notifying him of the emergency need for his services.

Memorial objected to the question on the basis of hearsay and a privilege arising from sections 8—2101 and 8—2102 of the Code (Ill. Rev. Stat. 1989, ch. 110, pars. 8—2101, 8—2102). In making an offer of proof, out of the presence of the jury, the following colloquy took place:

"Q. [By plaintiffs' counsel:] Mr. Funk, did you have occasion to discuss the matter of a delay with Dr. Draper?

A. Yes.

Q. And what did he advise you as to the reason for the delay?

A. He told me that the reason for delay was that there were some, either one or two, new secretaries down in the OB [obstetrics] department.

Q. And he indicated they didn't know the proper method or the most effective method of paging you?

A. Yes."

Funk then acknowledged that (1) the conversation took place on Memorial's seventh floor two or three days after the child's birth; (2) Dr. Draper had asked if he "had a minute to spare"; and (3) their discussion concerned the events of January 11, 1987. Funk indicated Dr. Draper started the conversation and it was conducted on an informal basis.

Memorial seeks to justify the circuit court's rejection of the offered evidence upon the basis of the foregoing Code provisions which it raised in its objections. Section 8—2101 of the Code states in pertinent part:

"Information obtained. All information, interviews, reports, statements, memoranda or other data of *** health maintenance organizations, physician-owned inter-insurance exchanges and their agents, or committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care, shall be privileged, strictly confidential and shall be used only for medical research, the evaluation and improvement of quality

care, or granting, limiting, or revoking staff privileges ***." (Ill. Rev. Stat. 1989, ch. 110, par. 8—2101.)

Section 8—2102 of the Code provides:

"Such information, records, reports, statements, notes, memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency or person. The disclosure of any such information or data, whether proper, or improper, shall not waive or have any effect upon its confidentiality, nondiscoverability, or nonadmissibility." Ill. Rev. Stat. 1989, ch. 110, par. 8—2102.

The purpose of the foregoing legislation "is to encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease" by making "such studies or programs" confidential. (*Niven v. Siqueira* (1985), 109 Ill. 2d 357, 366, 487 N.E.2d 937, 942.) In denying plaintiffs' offer of proof, the circuit court indicated plaintiffs had the burden of showing the evidence offered did not come within the privilege. However, generally the burden of showing that a privilege bars the introduction of relevant evidence is on the party objecting to the evidence. (*Cox v. Yellow Cab Co.* (1975), 61 Ill. 2d 416, 419-20, 337 N.E.2d 15, 17; *Krupp v. Chicago Transit Authority* (1956), 8 Ill. 2d 37, 42, 132 N.E.2d 532, 536.) That rule has been applied to the privilege asserted here. *Ekstrom v. Temple* (1990), 197 Ill. App. 3d 120, 127, 553 N.E.2d 424, 428.

■ Here, Memorial offered very little evidence to support the existence of the privilege. Nevertheless, the information that inexperienced personnel who were unfamiliar with proper paging technique were the cause of the delay was "information *** of" the medical staff of an "accredited hospital" within the meaning of section 8—2101 of the Code. (Ill. Rev. Stat. 1989, ch. 110, par. 8—2101.) The information was voluntarily disclosed by Dr. Draper but section 8—2102 of the Code expressly provides that "disclosure of any such information *** shall not waive or have any effect upon its *** nonadmissibility." (Ill. Rev. Stat. 1989, ch. 110, par. 8—2102.) The more difficult question is whether the information was "used in the course of internal quality control *** for the purpose of *** improving patient care" within the meaning of section 8—2101 of the Code. Ill. Rev. Stat. 1989, ch. 110, par. 8—2101.

Nothing presented to the court at the time of the offer of proof indicates how Dr. Draper acquired his information. However, the parties acquiesced in consideration by the court of information con-

tained in depositions and other documents previously filed in the case. These documents had been considered by a judge—who did not try the case—in ruling upon an *in limine* motion in regard to the same evidence. In a deposition, Dr. Draper stated he did not remember whether he made the statement attributed to him by Funk but would not have made the exact statement attributed to him because the person involved in the paging was not new. Dr. Draper did state that the purpose of his questioning persons about the alleged delay in the furnishing of general anesthesia to Sheila Roach was to assure quality in the services rendered by the department of which he was the chief, and this was part of his job.

The information acquired by Dr. Draper purportedly to assure quality in service was not part of a formal report as was held to be privileged in *Flannery v. Lin* (1988), 176 Ill. App. 3d 652, 531 N.E.2d 403, and *Sakosko v. Memorial Hospital* (1988), 167 Ill. App. 3d 842, 522 N.E.2d 273, but we conclude that material privileged under the instant legislation need not be part of a formal report.

In contending the information involved here was not privileged, plaintiffs rely on *Ekstrom* (197 Ill. App. 3d at 127, 553 N.E.2d at 428), *Willing v. St. Joseph Hospital* (1988), 176 Ill. App. 3d 737, 531 N.E.2d 824, and *Marsh v. Lake Forest Hospital* (1988), 166 Ill. App. 3d 70, 519 N.E.2d 504. In *Ekstrom*, the court determined that documents produced for other than internal quality control or medical study activities were not subject to privilege. In *Willing*, privilege was denied to (1) applications for appointment to staff; (2) initial privileges granted and any and all changes to the privileges, including restrictions and revocations; and (3) all physicians' letters of resignation or withdrawal as they pertained to a doctor defendant, whether prior to or after the operation in question—except those connected to peer-review procedures. In *Marsh*, privilege was denied to reports of polygraph tests of nurses in connection with allegations that the nurses had altered records involved with the death of a patient. In none of the cases was the information involved connected to internal quality control, as was the case here. Only *Marsh* comes close to this, and there the focus of the investigation seemed to be more toward placement of blame rather than to study procedures for improving care to patients.

■ The next issue to be considered concerns not only the exclusion of evidence but also plaintiffs' contention that they should be granted a new trial because of discovery violations. The record supports plaintiffs' assertion that early in the case Memorial gave false or improper information in response to plaintiffs' discovery re-

quests. The circuit court then imposed sanctions upon Memorial for this conduct. In support of plaintiffs' theory that they are also entitled to a new trial, they cite *Varady v. Guardian Co.* (1987), 153 Ill. App. 3d 1062, 506 N.E.2d 708, where a new trial was awarded a party when the noncompliance with required discovery by an opposing party was not discovered until the second day of a jury trial. Here, Memorial gave proper discovery information more than three months prior to the first day of trial and made all payments imposed against it as a sanction. Plaintiffs assert they were particularly prejudiced in their preparation for trial because the false answers misled one of their expert witnesses. However, plaintiffs had adequate time to see that witness had correct information. As plaintiffs had adequate time to make corrections necessitated by the false information, and because Memorial made the reimbursements required as a sanction, a further sanction of the grant of a new trial is not appropriate.

▮ Plaintiffs further correctly point out that a party's furnishing false information has been held admissible as an admission, by conduct, of guilt. (*Lubbers v. Norfolk & Western Ry. Co.* (1983), 118 Ill. App. 3d 705, 711-12, 454 N.E.2d 1186, 1190-91, *aff'd* (1985), 105 Ill. 2d 201, 473 N.E.2d 955.) Plaintiffs offered in evidence the false discovery information furnished by Memorial. We need not determine whether that rule was applicable here, because we have not been advised of any place in the record which indicates these records were offered for this purpose. Rather, certain records of this nature were offered to explain the testimony of plaintiffs' expert witness, Dr. Weiner, because he relied on some of the misinformation in forming his opinions. Plaintiffs never laid a foundation for use of this information by asking Dr. Weiner if this information would change his opinion. The circuit court properly sustained objection to the offer of this evidence.

▮ Plaintiffs further contend the court erred in refusing to admit into evidence a statement made by Phyllis Dentinger in a deposition she had given in another case. At the time of that deposition, and at the time of the occurrence here, she was a registered nurse employed by Memorial and managing nurse for labor and delivery services. In that deposition she stated "the situation of a prolapsed cord would be a life and death situation that we would have to do a cesarean within ten minutes." Plaintiffs maintain this statement constituted an admission by a party opponent admissible as an exception to the hearsay rule. *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 115, 199 N.E.2d 769, 794; *Doherty v.*

*Kill* (1986), 140 Ill. App. 3d 158, 162, 488 N.E.2d 629, 632 (admission made by party in another case admissible in instant case).

The record does not contain the offer of or the objections to the excerpt from Dentinger's deposition. In the absence of a record, some inference arises that the court proceeded properly. (*Libco Corp. v. Roland* (1981), 99 Ill. App. 3d 1140, 1147-48, 426 N.E.2d 309, 315.) If some weighing of the probative value of the offered evidence against the prejudice it might create were involved, deference would be due the decision of the circuit court. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864.) The excerpt appears to be admissible, but we are not going to find reversible error in this decision of the circuit court on the basis of this record.

■■ Plaintiffs assert various claims of error in regard to exclusion of evidence concerning the care exercised by defendants Zinzilieta and Bradley. We conclude no reversible error occurred.

Plaintiffs offered exhibit No. U-4, which was identified as describing a Memorial nursing policy standard for evaluating a "contraction-stress" test, which stated that a flat fetal heart base line is an "ominous" sign. Plaintiffs maintain this standard supports the testimony of their expert that the flat basal monitoring tracing exhibited in the case of Sheila Roach signaled the existence of fetal distress. Plaintiffs maintain this document should have been admitted as evidence that the defendant obstetricians were negligent in continuing to have pitocin administered to Mrs. Roach. Hospital policies are admissible as standards of care for the treatment of patients within that hospital. (*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253.) Here, the relevance of the evidence is limited and, at best, it was only corroboration of other evidence. Moreover, the exhibit was shown to the jury with an overhead projection for a substantial period of time while it was hearing testimony. Also, portions of the exhibit were read to the jury by plaintiffs' counsel in formulating a question. Any prejudice to plaintiffs in refusing this evidence was slight, and no reversible error occurred.

■■ Similarly, no reversible error resulted from the circuit court's refusal to admit as substantive evidence plaintiffs' exhibit Nos. DD-12 and DD-14. The latter exhibit contained excerpts from Creasy and Resnik's textbook, Maternal Fetal Medicine. Plaintiffs recognize that Illinois case law has not permitted the introduction of texts as substantive evidence, but asks us to adopt Federal Rule of Evidence 803(18) (see 28 U.S.C. app. §803(18), at 777 (1988) (Fed. R. Evid. 803(18))). The supreme court held such texts inadmis-

sible in *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 258-59, 381 N.E.2d 279, 283, and has not retreated from that position. This court followed that rule in *Fornoff v. Parke Davis & Co.* (1982), 105 Ill. App. 3d 681, 690-91, 434 N.E.2d 793, 801, at least to the extent that, as here, the matter presented was only cumulative of other evidence. We follow *Walski* and hold that the court properly refused to admit exhibit No. DD-14.

Exhibit No. DD-12 was a page from Precis III, authored by the American College of Obstetricians and Gynecologists (ACOG). The defendants and their experts admitted familiarity with the exhibit and that it was used by obstetricians to prepare for their board exams. The pertinent part stated:

> "Periodic asphyxial stress patters. Periodic changes in the FHR [fetal heart rate] may signify intermittent asphyxial stress caused either by transient insufficiency of uterine blood flow or by transient insufficiency of umbilical blood flow. The former is indicated by late decelerations or any smoothly occurring and reasonably prolonged (*i.e.*, 1 minute) dip."

Plaintiffs argue that although the defendants agreed that "decelerations" were signs of fetal distress, they denied that a prolonged dip (in the heart rate) indicated the same thing. Plaintiffs offered exhibit No. DD-12 to rebut defendants' testimony that it was safe to continue to induce labor, because there were no "late decelerations" observed on the fetal monitor.

The parties disagreed on their definition of "deceleration." Plaintiffs argue that since defendants narrowly limited their definition of that term to "dips" in the fetal heart tracing that occurred during a uterine contraction, they could ignore many of the dips in the fetal heart rate that Dr. Weiner and plaintiffs' nursing expert Magiera testified were late decelerations.

Plaintiffs argue that any dip in fetal heart rate is significant, regardless of whether it meets defendants' definition of late decelerations. Plaintiffs maintain they were denied the opportunity to point out that the definition adopted by the ACOG undercuts the defendants' definition. Plaintiffs conclude that since Precis was evidence of the custom and terminology used by ACOG, it was erroneous to refuse the introduction of this document for the limited purpose for which it was offered.

While plaintiffs' exhibit No. DD-12 was somewhat similar to exhibit No. DD-14, it was not a text, in the strict sense, but a standard for obstetricians and gynecologists. Relevant industry standards

are usually admissible to show a standard of care. (*Ruffiner v. Material Service Corp.* (1987), 116 Ill. 2d 53, 58, 506 N.E.2d 581, 584; see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence §406.5, at 216 (5th ed. 1990).) This evidence was admissible but, as various medical witnesses were questioned about this standard and, in the process, the standard was read to the jury, any error was not reversible.

■ As a final claim of error in regard to the court's rulings on evidence offered by plaintiffs, they maintain the court prevented them from eliciting proper evidence in the taking of the evidence deposition of Dr. Stuart Weiner. Many objections were made by defendants to plaintiffs' questions, and the court often sustained the objections. Usually the questions were rephrased and objections were then overruled. In the situations where a line of questioning was cut off, plaintiffs never made an offer of proof as to the answer that would have been given, and the answer was not obvious. Thus, the propriety of the exclusion of the evidence cannot be challenged on appeal. *Chicago City Ry. Co. v. Carroll* (1903), 206 Ill. 318, 68 N.E. 1087; *Tarshes v. Lake Shore Harley Davidson* (1988), 171 Ill. App. 3d 143, 524 N.E.2d 1136; see M. Graham, Cleary & Graham's Handbook of Illinois Evidence §103.7, at 19 (5th ed. 1990).

■ Plaintiffs' major complaint in regard to the circuit court's ruling on instructions was that the court refused a tendered issues instruction, which included in the grounds of negligence to be passed upon by the jury plaintiffs' allegation that Memorial was negligent because its nurses failed to notify the attending doctors of abnormal fetal heart tones shown by the monitoring system. The instruction was refused on the basis that no expert testimony was presented showing that this was a proximate cause of the injuries involved. Memorial seeks to support the circuit court's ruling on that same basis.

As late as *Addison v. Whittenberg* (1988), 124 Ill. 2d 287, 529 N.E.2d 552, the supreme court has stated that to prevail in a malpractice case, a plaintiff must prove:

" 'the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury *proximately caused by the physician's want of skill or care.* (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256; *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423.)' (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 241-42.) Because laypersons

normally are not qualified to evaluate professional medical conduct, this court has stated that a plaintiff generally must *present expert testimony to establish the elements* of the cause of action; exceptions to the requirement of expert testimony have been found in cases in which the treatment is so common, or the act so grossly negligent, that a layman would be able to make a proper evaluation of the challenged conduct in the light of his own fund of experience and knowledge." (Emphasis added.) *Addison*, 124 Ill. 2d at 297, 529 N.E.2d at 556.

Thus, under the language in *Addison*, except in the very simple cases referred to therein, each element of a medical malpractice case must be supported by expert testimony. Here, in regard to the tendered instruction, possible medical malpractice by a nurse rather than a physician was in issue. The phenomena dealt with was complicated and not readily understood by laypersons. Nurse Lena Magiera was qualified by plaintiffs as an expert on obstetrical nursing practice. She testified after having examined monitoring data in regard to Sheila Roach during January 10 and 11, 1987. She expressed an opinion that, at least after 10:30 on January 11, this data contained information such that proper nursing procedure would have required nurses in attendance to immediately notify the physician involved of the irregularities in the fetal heart beats being recorded. This testimony provided expert proof of the standard of care involved and of breach of that standard.

The Magiera testimony did not provide expert testimony on the proximate cause issue. Plaintiffs contend Dr. Weiner provided that testimony when he stated that physicians rely upon nurses properly following a monitor and notifying them concerning abnormalities, and by his testimony that notification to Dr. Zinzilieta by 11:28 a.m. on January 11 was "urgent." This does not constitute an opinion on the existence of proximate cause between the alleged failure of the nurses and the injuries which are the subject of the case. Neither does testimony by Dr. Zinzilieta that he would have liked to have been notified at 11:26 a.m. on January 11, 1987, and that, if he had, he would have made preparations for performing a C-section at 11:33 a.m. that day, constitute such an opinion.

Plaintiffs, alternatively, maintain that no expert testimony on causation was necessary. They cite *Collins v. Westlake Community Hospital* (1974), 57 Ill. 2d 388, 312 N.E.2d 614. There, a five-year-old child had suffered a broken leg in an automobile collision, a blood clot resulted, requiring amputation of the leg. Suit was

brought for medical malpractice against the attending orthopedic physician and the treating hospital. Evidence was presented that the orthopedist had requested attending nurses to watch the boy's toes. Several days after the injury, the orthopedist came to the hospital at 6 a.m. after receiving a call from nurses indicating the child's foot was cold, and he had no feeling. The orthopedist immediately performed exploratory surgery, which revealed a clotting in the femoral artery. The supreme court concluded an inference could be drawn that the nurses failed to watch the child's foot during the night. Accordingly, the court overturned a judgment on a directed verdict for the hospital. The opinion did not discuss the question concerning any requirement for expert proof.

Similarly, in *Bugno v. Mt. Sinai Hospital Medical Center* (1990), 201 Ill. App. 3d 245, 559 N.E.2d 1, cited by plaintiffs, recovery against a hospital was upheld when an orthopedic patient suffered a blood clot in his leg while it was in a cast and then suffered a stroke. Expert medical evidence was presented that the stroke resulted from the clot, and the clot resulted from a cast which was too tight. Evidence showed the hospital personnel applied the cast. *Bugno* does not speak to the issue involved here.

We recognize the similarity between the situation here and that in *Collins*. However, that decision was rendered before *Walski* and its progeny cited in *Addison*. Most of these opinions have indicated that proximate cause is one of the issues which must be supplemented by expert testimony unless the question of malpractice is simple. The issue of the malpractice in *Collins* merely required nurses to look at feet. Here, highly sophisticated monitoring equipment was involved. We conclude that *Collins* does not control here, and that we should instead follow the requirements set forth in *Addison*. The circuit court properly refused plaintiffs' issues instruction.

■ Plaintiffs also maintain the circuit court erred in giving, over their objection, Illinois Pattern Jury Instructions, Civil, No. 12.05 (3d ed. 1991) (hereinafter IPI Civil 3d), which states:

"If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury.

[However, if you decide that the sole proximate cause of injury to the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant.]"

The notes on the use of IPI Civil 3d No. 12.05 indicate that the full instruction should not be used except where there is evidence tending to show that the sole proximate cause of the occurrence was something other than the conduct of the defendant. IPI Civil 3d No. 12.05. Notes on Use, at 12-11.

Dr. Mortimer G. Rosen, chairman of the Department of Obstetrics and Gynecology at the College of Physicians and Surgeons of the Presbyterian Hospital of the City of New York and of Columbia University, testified to an opinion that if a C-section had been performed on January 10, 1987, he would have expected the baby to be in the same condition as it was when born on January 11 after the emergency C-section. Thus, the jury could have found that the condition of the fetus in the womb prior to any failure to properly proceed was the sole proximate cause of the damage to the child. The giving of the instruction was proper.

 As a further ground for being granted a new trial, plaintiffs assert they were unfairly prejudiced because the wife of one of the jurors had recently been a patient of Dr. Zinzilieta. Plaintiffs did not become aware of this until after trial. They then presented the issue, together with an affidavit by the juror, in which the juror stated the following: (1) he did not know of this relationship at the time of *voir dire*; (2) he found out about it during the course of the trial, but (3) did not report this information to the court because he did not think it was significant. Plaintiffs rely upon the decision of this court in *Marcin v. Kipfer* (1983), 117 Ill. App. 3d 1065, 454 N.E.2d 370. There, we granted a new trial to a plaintiff in a medical malpractice case when, on jury selection, the court had overruled challenges for cause as to two jurors who were regular patients of the general practitioner charged with the malpractice. Both jurors had testified they could be fair and impartial.

This court indicated in *Marcin* that its decision was limited to the particular facts of that case and should not be broadly considered. In *People v. Cole* (1973), 54 Ill. 2d 401, 413, 298 N.E.2d 705, 712, the supreme court stated that exclusion of a prospective juror is only required when the juror is shown to have an opinion that raises a presumption of partiality. This court has held that the fact that a prospective juror is the father of an assistant State's Attorney in the county where the case was being tried did not require exclusion of that prospective juror in a criminal case. *People v. Cobb* (1989), 189 Ill. App. 3d 86, 544 N.E.2d 1257.

Here, the relationships involved are not as close as in *Marcin*. There, two jurors were involved. Here, only one is involved. There,

the jurors themselves were the patients of the defendant doctor. Here, the juror is merely the spouse of the defendant doctor's patient. Clearly, the relationship is more remote. Here, the juror's affidavit states that his wife intended to consult Dr. Zinzilieta for services within his specialty, while in *Marcin*, both jurors indicated they would be consulting the defendant doctor in the future for general purposes. No new trial is required because of the relationship between the juror and defendant Zinzilieta.

■■ Finally, defendant seeks a new trial on the basis of the doctrine of cumulative error. (See *Andes v. Lauer* (1980), 80 Ill. App. 3d 411, 399 N.E.2d 990.) That doctrine is not one which this court has deemed to be frequently applicable. (*People v. Lindgren* (1982), 111 Ill. App. 3d 112, 443 N.E.2d 1129.) Any errors we recognize here concerned the refusal of evidence (1) the probative value of which was not great, and (2) which was cumulative; or (3) the jury was apprised of the content of a document, although it was not admitted into evidence. Thus, individually or cumulatively, the prejudice to plaintiffs arising from any such error was very small. The case was long and complicated. Plaintiffs did not obtain a perfect trial but received a fair one.

We affirm for the reasons stated.

Affirmed.

STEIGMANN and KNECHT, JJ., concur.