SUSAN HOEM, as Ex'r of the Estate of Richard A. Hoem, Plaintiff-Appellant, v. MICHAEL J. ZIA *et al.*, Defendants-Appellees.

Fourth District No. 4—92—0048

Opinion filed December 31, 1992.—Rehearing denied February 3, 1993.

604

Alexandra de Saint Phalle, of Londrigan, Potter & Randle, P.C., of Springfield, for appellant.

John E. Fick, of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellee Decatur Memorial Hospital.

Michael J. Kehart and Albert G. Webber, both of Kehart, Shafter, Hughes & Webber, P.C., of Decatur, for appellees Michael J. Zia and Central Illinois Lung Internists Associates.

Richard F. Record, Jr., of Craig & Craig, of Mattoon, for appellee J. Steven Arnold.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In March 1990, plaintiff, Susan Hoem, filed this medical malpractice action against defendants, Dr. Michael Zia, Dr. J. Steven Arnold, Decatur Memorial Hospital, and Central Illinois Lung Internists Associates. In her complaint, plaintiff alleged that defendants failed to diagnose and prevent the impending heart attack of her husband, Richard Hoem, that resulted in his death in November 1988. After a trial, the jury rendered a verdict for defendants. Plaintiff appeals, arguing that the trial court (1) erred by admitting testimony by Dr. Zia regarding what the decedent told him, and thus violated the Dead Man's Act (Ill. Rev. Stat. 1991, ch. 110, par. 8—201); (2) improperly limited plaintiff's expert witness' testimony; (3) failed to instruct the jury that the negligence of a subsequent party does not exonerate a prior act of negligence; (4) should have granted summary judgment for plaintiff on the issue of whether Dr. Arnold was an agent of the hospital; (5) erred in many of its evidentiary rulings; and (6) erroneously denied plaintiffs' motion for judgment notwithstanding the verdict (JNOV).

We reverse and remand for a new trial.

I. BACKGROUND

Richard Hoem, a former nuclear maintenance inspector at the Clinton Nuclear Power Plant, died at the age of 43 of a heart attack on November 28, 1988, one day before he was scheduled to be seen by a cardiologist. Plaintiff alleges that Dr. Zia, along with his medical partner, Dr. Steven Arnold, negligently failed to recognize clear medical signs of Hoem's impending heart attack and to refer him immediately to a cardiologist for treatment.

Hoem underwent a physical examination in March 1988. An electrocardiogram test (EKG) done as a part of this examination revealed no signs of heart problems. During the summer of 1988, Hoem began to develop problems with his endurance. Although he frequently played golf and bowled, he started limiting his activities and eventually stopped golfing and bowling in the fall of 1988. In August 1988, he went to his family doctor, Dr. Miller, complaining of chest pain and shortness of breath. Dr. Miller referred Hoem to a neurosurgeon in September, who diagnosed Hoem's pain as "musculoskeletal." This doctor prescribed no treatment for Hoem's condition. Hoem instead sought treatment from his chiropractor, who had seen Hoem regularly

since 1986. In the fall of 1988, Hoem visited this chiropractor 13 times for his pain.

Hoem was seen by defendant Dr. Michael Zia in 1984 regarding a lung problem. Hoem had failed a lung test in 1983 that his employer required in order for Hoem to work in a certain position at a nuclear power plant. In 1984, Hoem was seen by Dr. Zia regarding this condition. Although the 1983 test indicated that Hoem suffered from pleural effusion (fluid in the lungs), this fluid had unexplainably thickened into a mass in his left lung when Dr. Zia saw Hoem. The record does not indicate how Dr. Zia treated this condition, but it apparently did not require sustained treatment, and Hoem did not see Dr. Zia again until 1988.

Thinking that his problems in the fall of 1988 might relate to this lung condition, Hoem again went to Dr. Zia on October 31, 1988. Dr. Zia did not direct on that date that Hoem take an EKG. Plaintiff claims Dr. Zia should have done so because Hoem allegedly complained of some textbook indicators of heart problems. Instead, Dr. Zia administered a series of tests designed to detect lung problems and scheduled Hoem to undergo a cardiopulmonary stress test to measure lung capacity and fitness on November 11, 1988.

Because Dr. Zia was on vacation on November 11, 1988, his partner, Dr. Arnold, administered this test. During the test, Hoem exercised on a stationary cycle while an EKG monitored his heart rate as he breathed into a tube that monitored his lung capacity, strength, and endurance. The test also monitors blood pressure. Hoem warmed up for 3 minutes and then exercised for 6 minutes and 20 seconds on the stationary cycle while these instruments monitored his endurance. During the stress test, Hoem did not complain of any chest pain, which defendants contend shows that he did not suffer from heart problems at that time.

Dr. Arnold did not prepare a test report until two weeks later. Dr. Daniel Fintel, a cardiologist from Chicago, testified that the reading from the EKG taken during the test revealed certain heart problems that indicated that Hoem had recently suffered a "silent heart attack." He testified that had Dr. Arnold immediately prepared a report, he should have noticed this fact from the test results. He further testified that when Dr. Arnold did prepare the report, Dr. Arnold failed to notice the urgency of Hoem's condition and to hospitalize Hoem immediately under the care of a cardiologist.

Instead, on November 21, Dr. Arnold notified Hoem that he had found a "blockage" on the test and had scheduled Hoem to meet with a cardiologist, Dr. Krishan Patel, a week later, on November 29, 1988.

Hoem went to Chicago for Thanksgiving the weekend before this appointment and allegedly complained further of radiating pain in his chest. However, when he returned to work on November 27, the day after Thanksgiving, Hoem made no complaints to his secretary about his condition and did not seem to her to be experiencing any discomfort.

The next day, November 28, after Hoem walked up a flight of stairs to reach his office, he collapsed. His secretary immediately called the emergency medical technicians who worked at the Clinton power plant. Despite their efforts, Hoem did not survive this heart attack.

Dr. Zia and Dr. Arnold are both board-certified internists and pulmonologists. Plaintiff used Dr. Fintel, a board-certified internist and cardiologist, as her only expert in her case in chief. Defendants responded by calling themselves and three other doctors as medical experts: Dr. Patel (the cardiologist whom Hoem was scheduled to see), Dr. William Buckingham (a board-certified internist and pulmonologist), and Dr. Patrick Sullivan (a board-certified internist).

As mentioned above, Dr. Fintel testified that the EKG and medical charts showed clear signs of a prior heart attack and clear warnings of an impending heart attack. Among other things, Dr. Patel testified, contrary to Dr. Fintel's testimony, that the medical results from Hoem's test did not present an urgent medical condition. He added that, if he had read the charts and results from Hoem's test immediately after Hoem took the test, he would not have done anything differently than what Dr. Arnold had done. Dr. Buckingham and both defendants testified that although Dr. Fintel may know the standard of care for a *cardiologist*, he did not testify to the applicable standard of care for *pulmonologists*. All three testified that although cardiologists might notice subtle, but life-threatening, heart problems from Hoem's medical data, pulmonologists would not notice these subtle problems. Further, they all attributed Hoem's complaints of chest pains as symptoms of his lung problems, not his heart problems. Dr. Sullivan and both defendants testified essentially to the same standard of care regarding internists.

Plaintiff attempted to present Dr. Robert Schoene, a board-certified pulmonologist, in rebuttal to testify that Dr. Fintel had accurately stated the applicable standard of care for *pulmonologists*. However, the trial court severely restricted the extent to which plaintiff could do so under the general theory that plaintiff could have presented Dr. Schoene in her case in chief, but failed to do so.

As stated earlier, the jury returned a verdict for all defendants.

## II. Analysis Of Reversible Errors

### A. *Testimony to a Conversation with the Decedent under the Dead Man's Act*

The plaintiff first argues that the trial court erroneously allowed Dr. Zia to testify about what Richard Hoem, the decedent, said to Dr. Zia on October 31, 1988, when Hoem was seen by Dr. Zia. Plaintiff argues that the admission of this testimony violates the Dead Man's Act (Act) (Ill. Rev. Stat. 1991, ch. 110, par. 8—201). We agree.

●1 Defendants admit that Dr. Zia ordinarily could not testify about his conversation with Hoem under the Act. However, here they argue that plaintiff offered evidence that triggered the first exception listed in the Act: an adverse party may testify to a prior conversation with a now-deceased person when another person testifies to that conversation on behalf of the representative of the dead person. See Ill. Rev. Stat. 1991, ch. 110, par. 8—201(a).

The Act provides the following:

"In the trial of any action in which any party sues or defends as the representative of a deceased person ***, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased *** or to any event which took place in the presence of the deceased ***, except in the following instances:

(a) If any person testifies on behalf of the representative to any conversation with the deceased *** or to any event which took place in the presence of the deceased ***, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event." Ill. Rev. Stat. 1991, ch. 110, par. 8—201.

Professor Michael H. Graham writes the following regarding the Act:

"Its purported purpose is to remove the temptation of the survivor to a transaction to testify falsely and to equalize the positions of the parties in regard to the giving of testimony. [Citations.] The Dead Man's Act manifests the cynical view that a party will lie when she cannot be directly contradicted and the unrealistic assumption that jurors, knowing the situation, will believe anything they hear in these circumstances. While motivated by the laudable desire to protect decedent's and legally disabled person's assets from attack based on perjured testimony, the validity of this approach is questioned with vigor

***. [Citation.] *** [I]t is by far the most frequent source of controversy over the competency of witnesses. Without considering the effect of the vast amount of litigation generated by the Dead Man's Act, it is felt that the Act should be abrogated on the ground that this surviving relic of the common law disqualification of parties as witnesses leads to more miscarriages of justice than it prevents." M. Graham, Cleary & Graham's Handbook of Illinois Evidence §606.1, at 314-15 (5th ed. 1990).

Nonetheless, the Act remains the law in Illinois and mandates that no adverse party shall be allowed to testify on his behalf to conversations he had with the deceased before the death of the deceased.

In the present case, this issue arose out of a medical note that Dr. Zia prepared after his meeting with Hoem on October 31, 1988. Plaintiff introduced this note into evidence during her case in chief. The note reads as follows:

> "Patient comes for follow-up today. *He is complaining of pain and tightness in the upper chest area.* This occurs primarily with exertion and does seem to radiate down his arms. He was initially evaluated by Dr. Hubbard for cervical arthritis and arthralgias and this has not been a problem recently. He is having no fevers, chills, sweats, palpitations, heart irregularity, wheezing, sputum production or other complaints.

> *On exam today* he has blood pressure 144/100, states this is frequently high on visits to the doctor but is otherwise normal. He does not have any wheezing. The diaphrams appear to move well bilaterally. Cardiac exam is entirely normal. He has no peripheral edema or peripheral findings.

> *Based on the above* we have ordered a chest x-ray and asked x-ray to check for diaphragmatic motion. He has had previous left pleural thickening on a somewhat idiopathic basis. We have also ordered a complete pulmonary function with methacholine challenge and possible cardiopulmonary stress test depending on the above. We will call him after the above results and schedule any additional testing that is necessary." (Emphasis added.)

Based on the information found in this note, Dr. Fintel, plaintiff's expert in her case in chief, testified that because Hoem complained *at the October 1988 visit* of chest pains and tightness, Dr. Zia should have explored possible heart problems.

During defendants' case in chief, Dr. Zia then testified that Hoem did not complain of chest pain during this October 1988 visit, and

then clarified what Hoem actually did say regarding his symptoms. Dr. Zia testified as follows:

"[Defense Counsel]: I think I had asked you, Doctor, did Mr. Hoem say the reason he was back?

[Dr. Zia]: Yes, he did.

[Defense Counsel]: *What did he say?*

[Dr. Zia]: As Mrs. Hoem had mentioned earlier, *he had come back for a follow up on his lung condition and his shortness of breath.*

[Defense Counsel]: *What did Mr. Hoem tell you* by way of history, Doctor?

[Dr. Zia]: His symptoms *he mentioned* began about August and there was a C spine symptom; that was my abbreviated way of describing it. Pain which was C spine pain, in the back of the neck, and tightness in the posterior thorax or back of the chest, upper chest, just below the neck. That symptom did seem to radiate into his arm, as many people have described. He did notice it more with exertion and exertion, of course, can mean a lot of things; golf, bowling, lugging suitcases, any upper as well as lower body exertion. *He said that* this symptom had already been evaluated, had initially been evaluated by Dr. Hubbard because someone had told him he had cervical arthritis and arthralgia. *He had already been placed on a trial of medication for cervical spine muscular spasm symptoms*, that medicine being Flexural as documented in our medication list. *And he said that that worked and that had not been a problem recently. The chest, posterior chest tightness, neck pain going down his arm*[,] *had not been a problem recently.*

[Defense Counsel]: *What else did he tell you, Doctor, about his complaints?*

[Dr. Zia]: *He also mentioned* that he was short of breath now and that obviously was a symptom that we could *** that we as pulmonologists would be quite interested in. The shortness of breath was just that. When you try to take in a breath, it came up short, and an inability to take a deep satisfying breath. That symptom was there at rest, worse with exertion, as any shortness of breath might be.

***

[Defense Counsel]: Did you make a diagnosis, then, Doctor?

[Dr. Zia]: We had, of course, a baseline diagnosis of pleural thickening or fibrosis, plus we have a new symptom—not a diagnosis, but a symptom[—] *** when he said shortness of

breath now, dypsnea; that needed to be explained. *He also had by our history some pains in his neck and upper chest posteriorly*, going down his arm, *which he said had resolved and therefore obviously we were not very concerned about that, if it's gone*. It's been relieved, *especially since it was relieved with a trial of an appropriate medication*, a muscle relaxant. \*\*\* *That was not a problem. That was not why he was here.* \*\*\*

[Defense Counsel]: Did you say anything to Mr. Hoem concerning future symptoms?

[Dr. Zia]: Yes.

[Defense Counsel]: What did you say?

[Dr. Zia]: I told him to report to us any increased or further symptoms. Which is standard practice." (Emphasis added.)

Dr. Zia's testimony obviously falls within the first paragraph of the Act because he testified to a conversation with Hoem in a lawsuit brought by Hoem's executor against Dr. Zia. Thus, the trial court should not have allowed Dr. Zia to testify about his conversation with Hoem unless one of the exceptions to the Act applies.

■ Defendants present several arguments supporting Dr. Zia's testimony. First, Dr. Arnold's counsel argues that the Act is an unconstitutional attempt by the legislature to infringe upon a trial court's judicial authority to determine the competency of witnesses. We reject this argument completely. The legislature has frequently passed laws regarding the admissibility of evidence and the competency of witnesses. (See Ill. Rev. Stat. 1991, ch. 38, par. 115—14 (witness competency); Ill. Rev. Stat. 1991, ch. 38, par. 115—5 (business records); Ill. Rev. Stat. 1991, ch. 38, par. 115—5.1 (coroner reports); Ill. Rev. Stat. 1991, ch. 38, par. 115—7 (rape shield statute); Ill. Rev. Stat. 1991, ch. 38, par. 115—12 (prior identifications); Ill. Rev. Stat. 1991, ch. 38, par. 115—10.1 (prior inconsistent statements); Ill. Rev. Stat. 1991, ch. 38, par. 115—13 (statements made to medical personnel); Ill. Rev. Stat. 1991, ch. 38, par. 115—10 (statements made by a sex-offense victim under 13 years of age).) All of these statutes reflect public policy, as determined by the legislature, on how some aspect of trials in this State shall be conducted. Clearly the legislature possesses the authority to make such public policy determinations. *People v. Rolfingsmeyer* (1984), 101 Ill. 2d 137, 140, 461 N.E.2d 410, 412 (legislature has power to prescribe new and alter existing rules of evidence or to prescribe methods of proof).

Dr. Arnold's counsel maintains that the foregoing—and incomplete—list of statutes pertains to evidentiary and witness issues in

criminal trials, not civil trials. However, criminal trials must provide *more* stringent protections than civil trials because a criminal defendant's freedom is at stake in a criminal trial. Thus, to the extent that the legislature improperly infringes upon the judicial province to determine matters of witness competency and evidence reliability, that infringement would certainly be more serious in criminal trials because of the potential to have a negative impact on a defendant's constitutional protections. Furthermore, defendants cite no case holding that the legislature has improperly infringed upon the judicial province by its enactments regarding questions of evidence and witness competency. We hold that the Act is constitutional.

■ Dr. Arnold's counsel also argues that Dr. Zia did not testify to a conversation, but instead to an "event." Citing *Zorn v. Zorn* (1984), 126 Ill. App. 3d 258, 263, 464 N.E.2d 879, 883, defendant argues that this court has held that an event "includes all of the connected incidents and conversations leading up to [the facts at issue]." However, the present case does not involve testimony about an event; it plainly involves testimony to a *conversation* with the deceased. *Zorn* dealt with testimony of an event which took place in the presence of the deceased (the signing of a deed by the decedent), not a conversation. Thus, *Zorn* does not apply to this case at all. We refuse to allow parties to end-run around the Act by mischaracterizing conversations as events when the statute clearly distinguishes between the two. See *Vazirzadeh v. Kaminski* (1987), 157 Ill. App. 3d 638, 645, 510 N.E.2d 1096, 1100-01 ("[s]ince we would choose not to find redundancy in our laws, we assume that the legislature intended to make a distinction [in the Act] between verbal exchanges and other types of activity and considered conversations to be entities separate from the events surrounding them").

■ Dr. Zia's counsel presents more meritorious arguments in support of the trial court's ruling that his testimony did not violate the Act. First, he argues that plaintiff opened the door to testimony about the conversation between Dr. Zia and Hoem by introducing Dr. Zia's note as an exhibit. In particular, defendant argues that "[t]he Dead Man's Act makes an exception to its bar of admission of conversations with a decedent when the decedent's representative himself introduces *evidence* about a 'conversation or event.' " (Emphasis added.) In effect, Dr. Zia argues that plaintiff, by introducing Dr. Zia's medical note, opened the door for Dr. Zia to explain what Hoem *really* said in the October 31, 1988, visit.

However, defendant incorrectly states that the exception applies when the representative of the decedent introduces *evidence* about a

conversation. This paraphrasing would lead one to believe that any reference to a conversation in exhibits or other evidence would lift the protection of the Act. It does not. The Act's prohibition and exception thereto expressly apply only to *"testimony* to" a conversation. Although both are types of evidence, an exhibit is not testimony, and we will not extend the statute beyond its clear and plain terms.

■ Defendants next argue that plaintiff opened the door to Dr. Zia's testimony when plaintiff's expert, Dr. Fintel, testified about what Dr. Zia's note meant to him. In order to address this issue, we must decide what it means to "testify *to* a conversation." If, on the one hand, the legislature broadly meant "testify generally *about* a conversation," then the defendants correctly conclude that because Dr. Fintel testified about the conversation, Dr. Zia could also testify about it. On the other hand, if the legislature meant a more narrow reference, to include only direct testimony about the *actual things said during the conversation,* then Dr. Fintel could not "testify to" the conversation because he did not witness it and, absent hearsay, could not know what Hoem said to Dr. Zia.

We hold that the legislature clearly intended this latter interpretation. In *Vazirzadeh,* the defendant doctor similarly testified that the decedent did not complain of the types of chest pain that would signal the cause of his impending death. (*Vazirzadeh,* 157 Ill. App. 3d at 643, 510 N.E.2d at 1099.) The trial court allowed this testimony because the decedent's wife had testified to *another* conversation between her and the decedent. (*Vazirzadeh,* 157 Ill. App. 3d at 644, 510 N.E.2d at 1100.) The appellate court reversed, holding that the widow's testimony to another conversation did not open the door to allow the defendant doctor to testify to what the decedent had told him in a private conversation between the two. (*Vazirzadeh,* 157 Ill. App. 3d at 644, 510 N.E.2d at 1100.) In so holding, the court noted that under the Act, "[o]nly unwitnessed conversations with the decedent are off limits." (*Vazirzadeh,* 157 Ill. App. 3d at 645, 510 N.E.2d at 1101.) "A conversation with a patient regarding symptoms, treatment, etc., or the relevant conclusions resulting therefrom, can be noted on the patient's chart. *** [However,] [t]hat medical records are admissible under the rules controlling the admission of business records is but an extrinsic benefit." *Vazirzadeh,* 157 Ill. App. 3d at 645, 510 N.E.2d at 1101.

This interpretation also squares with the policy behind the Act. Professor Graham writes the following regarding this exception to the Act: "This exception [reflects] the policy of the Dead Man's Act not to disadvantage the living but rather to put the parties on an equal

footing." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §606.6, at 326 (5th ed. 1990).) This policy manifests itself by removing the shackles of incompetency from the adverse party and allowing him to testify to the conversation when another witness—present when the conversation occurred—testifies to that conversation on behalf of the representative of the decedent. Without this exception, the Act could cause the very injustice it seeks to eliminate by prohibiting the adverse party from rebutting a third party who testifies to the conversation, thereby allowing that third party to lie with impunity.

Dr. Fintel's testimony, however, did not place defendants at such a disadvantage. Through his testimony, Dr. Fintel merely tried to *explain* and *interpret* from a medical standpoint what the first paragraph of the note meant. He did not claim to know what Hoem actually said to Zia beyond what the note said, nor did he contradict the note with additional facts about that conversation. Dr. Zia, on the other hand, *supplemented* the note with extra testimony about what Hoem allegedly said to him that Dr. Zia did not include in his note. This testimony differs in kind from Dr. Fintel's testimony, which merely explained the note and did not factually supplement it at all. Without Dr. Zia's testimony purporting to supplement the note, the parties would remain on equal ground, both being relegated to arguing how to *interpret* the first paragraph of the note.

Citing *Goad v. Evans* (1989), 191 Ill. App. 3d 283, 300, 547 N.E.2d 690, 701, defendants argue that when a party representing the decedent introduces an admission regarding facts that only the decedent and defendant could know or contradict, defendant may testify to matters that only the decedent could contradict to rebut that admission. In *Goad,* the decedent's executor sued defendant for allowing decedent to drive while he was obviously intoxicated. Decedent (a 15-year-old boy) died while driving the car of defendant (a 16-year-old friend of decedent) while decedent was drunk. The plaintiff in that case had "admitted" that the decedent was drunk while he drove defendant's car. Besides subjecting plaintiff's case to comparative negligence, this "admission" in part established plaintiff's case against defendant. However, under the theory that the Act generally prevents a party from testifying to anything that only the decedent could contradict (*Goad*, 191 Ill. App. 3d at 300, 547 N.E.2d at 701), the trial court prohibited the defendant from testifying that the decedent was not obviously drunk because only the decedent could contradict that testimony. This court reversed the trial court because preventing the defendant from doing so put the defendant at the

tremendous disadvantage of not being able to rebut plaintiff's "admission" that the decedent was drunk. Thus, in *Goad*, the admission that triggered the exception did place the adverse party at a factual disadvantage; the defendant could not rebut that "admission" without testifying to facts that only the decedent could contradict.

In the present case, plaintiff tries to distinguish *Goad* by arguing that the plaintiff representative in *Goad* offered her own "admission," whereas the plaintiff in this case offered the admission of her opponent. This difference makes no difference. The significant difference between this case and *Goad* lies in the fact that the plaintiff's "admission" in *Goad* pertained to *facts* that only the defendant and decedent knew. As pointed out above, however, Dr. Fintel did not "testify to" a factual matter that only Hoem and Dr. Zia could know about (namely, what they said to each other during their private conversation); instead, he merely *interpreted* facts as contained in the medical notes provided by Dr. Zia. Because Dr. Fintel did not testify to factual matters that only decedent or defendant could contradict or support, defendants needed only to *argue* in rebuttal that Dr. Fintel's interpretation was incorrect; they did not need to present testimony that the facts underlying Dr. Fintel's interpretation were different than as contained in the note.

■ We therefore hold that the trial court erred in allowing Dr. Zia to testify to what Hoem told him during their private conversation. Because this testimony strikes to the very heart of what Dr. Zia should have known based on his examination on October 31, 1992, we consider this error reversible.

### B. *The Testimony of Plaintiff's Expert, Dr. Schoene*
Plaintiff next argues that the trial court improperly restricted her use of Dr. Robert Schoene, a board-certified pulmonologist, as an expert witness. Plaintiff first contends that the trial court abused its discretion by refusing to permit Dr. Schoene to testify as an expert witness in her case in chief. Second, plaintiff argues that once the trial court allowed Dr. Schoene to testify as an expert in rebuttal, it improperly limited the extent to which Dr. Schoene could rebut defendant's experts and bolster her other expert's credibility.

Regarding plaintiff's first argument, she originally disclosed only Dr. Fintel as an expert for her case in chief. In August 1991, defendants filed a motion for summary judgment based on their claim that because plaintiff's only named expert, Dr. Fintel, was a cardiologist, he could establish neither the standard of care for a pulmonologist nor any deviation therefrom. Thus, in her September 1991 response to

defendants' summary judgment motion, filed two months before the November 1991 trial, plaintiff asked the trial court to add Dr. Schoene to the list she previously disclosed under Illinois Supreme Court Rule 220 (134 Ill. 2d R. 220) of expert witnesses she intended to call in her case in chief.

The trial court denied defendants' motion for summary judgment and held that Dr. Fintel's testimony could suffice to establish the appropriate standard of care and any deviation therefrom because Dr. Fintel and defendants were all board-certified internists, and because of the close relation between the fields of pulmonology and cardiology and Dr. Fintel's experience in both. However, the court refused to permit Dr. Schoene to testify in plaintiff's case in chief because plaintiff did not originally disclose him as an expert in her case in chief; instead, she named only Dr. Fintel. The court explained that the ensuing delays from allowing plaintiff to add Dr. Schoene as an expert in her case in chief would be unnecessarily burdensome. Plaintiff argues that the court abused its discretion in so ruling.

We need not address this argument because plaintiff conceded at oral argument that she only needed Dr. Schoene as a rebuttal witness. Because Dr. Fintel sufficed in the trial court's judgment to get plaintiff beyond defendants' motion for a directed verdict, she did not need to present a pulmonologist in her case in chief. However, plaintiff argues that she did need a pulmonologist to testify in rebuttal in order to rebut the claims by defendants' experts that plaintiff's expert (a cardiologist) did not correctly state the applicable standard of care for pulmonologists. We agree.

Briefly summarizing the underlying facts, plaintiff relied on Dr. Fintel (a cardiologist) to establish the standard of care in her case in chief. After plaintiff rested, the trial court denied defendants' motion for a directed verdict, thus indicating that it found Dr. Fintel's testimony legally sufficient. Defendants then countered in their case in chief with several pulmonologists who testified that although Dr. Fintel probably correctly stated the applicable standard of care for cardiologists, he did not correctly state the applicable standard of care for pulmonologists. They further testified that the medical records and information that Dr. Zia received would not have signaled Hoem's impending heart condition to a pulmonologist, especially because pulmonologists are trained to notice mostly lung conditions and the tests Dr. Zia ran focused on identifying lung problems. Plaintiff then offered Dr. Schoene (a pulmonologist) in rebuttal to testify that Dr. Fintel *did* correctly state the applicable standard of care for pulmonologists, and that a pulmonologist such as himself would have noticed

Hoem's impending heart condition and sent Hoem immediately to obtain treatment for it. Defendants objected to Dr. Schoene's testifying in rebuttal, and the court sustained that objection.

The trial court held that Dr. Schoene could not testify to the general standard of care for pulmonologists because plaintiff should have presented that evidence in her case in chief. Thus, defendants were able to parlay the court's earlier ruling under Rule 220 denying plaintiff's request to have Dr. Schoene testify as an expert in her case in chief into a ruling that Dr. Schoene could *never* testify regarding the applicable standard of care. Defendants *additionally* objected to Dr. Schoene's rebuttal testimony regarding the following nine specific issues:

(1) whether Dr. Schoene could testify that dypsnea (pain while breathing) is a symptom of both lung and heart disease, contrary to testimony from defendants' experts that it results from only lung disease;

(2) whether a pulmonologist would refer to a person's anterior chest (back) as "chest" or "anterior chest" in a medical record;

(3) whether Dr. Schoene could rebut testimony that Hoem possibly could not have undergone bypass surgery because he might have suffered from "single vessels disease";

(4) whether Dr. Schoene could testify that Dr. Arnold should and could have read the EKG results immediately even though Dr. Arnold testified that it takes an hour to read and thereby cannot be done until after the visit;

(5) whether Dr. Schoene could rebut Dr. Zia's testimony regarding what a pulmonologist would notice from Hoem's symptoms and EKG as opposed to what a cardiologist like Dr. Fintel would notice;

(6) whether Dr. Schoene could testify regarding the purpose of the stress test Hoem underwent;

(7) whether Dr. Schoene could rebut testimony by Dr. Patel and Dr. Sullivan that the early pains Hoem experienced must have resulted from lung problems and could not have indicated Hoem's heart condition because he experienced no chest pain during the stress test;

(8) whether Dr. Schoene could testify that Dr. Arnold should have reviewed Hoem's prior medical record and thereby known to look for heart problems and whether Dr. Arnold negligently failed to immediately notify Hoem of his heart problem; and

(9) whether the pathologist's autopsy established that Hoem died from a second heart attack or instead did not eliminate the possibility that Hoem died from another heart-related ailment other than a heart attack.

After a lengthy hearing on defendant's motion to exclude testimony on these nine issues, the trial court allowed Dr. Schoene to testify regarding issues (1), (2), and (4). The court also allowed Schoene to testify regarding issue (9), but only if he could testify that he was qualified to read pathologists' reports. The court sustained defendants' objection regarding issues (3), (7), (8), and (9). The defendants withdrew their objection regarding issue (6).

The trial court noted that issue (5) bordered on Dr. Schoene's testifying about the applicable standard of care, which the trial court had forbidden. Nonetheless, the court initially indicated that it would allow Dr. Schoene to testify regarding (5) during the hearing on defendants' objections to Dr. Schoene's anticipated testimony, so long as Dr. Schoene limited his testimony to the specific question and did not testify about the applicable standard of care or breach thereof. However, once Dr. Schoene began to testify on this matter, the trial court completely prevented him from doing so.

In both civil and criminal cases, "rebuttal evidence" is evidence that the plaintiff or prosecution offers to explain, repel, contradict, or disprove evidence presented by the defendant. (See *Barth v. Massa* (1990), 201 Ill. App. 3d 19, 33, 558 N.E.2d 528, 537; *People v. Williams* (1991), 209 Ill. App. 3d 709, 723, 568 N.E.2d 388, 396.) The trial court has the discretion to admit or exclude rebuttal evidence, and a reviewing court will not disturb the trial court's decision absent an abuse of discretion. (*Barth*, 201 Ill. App. 3d at 33, 558 N.E.2d at 537; *Williams*, 209 Ill. App. 3d at 723, 568 N.E.2d at 396.) "[A]n abuse of discretion is likely to occur only when a party is prevented from impeaching witnesses, supporting the credibility of impeached witnesses, or responding to new points raised by the opponent." *Barth*, 201 Ill. App. 3d at 33, 558 N.E.2d at 537.

■ In the present case, the trial court understandably wanted to curb the length of a complicated, two-week trial. In doing so, however, it erroneously restricted Dr. Schoene from testifying in rebuttal to matters that defendants' experts raised *for the first time in their case in chief.* Specifically, the trial court erred by not allowing Dr. Schoene in rebuttal to reestablish the standard of care for pulmonologists and to testify that Dr. Zia and Dr. Arnold breached that standard of care. Defendants' experts had seriously impeached Dr. Fintel, plaintiff's expert, by claiming that the standard of care about which

he testified did not apply to the field of medicine at issue in this case. Plaintiff was entitled to rebut this testimony, and the trial court's failure to permit her to do so constitutes an abuse of the court's discretion and error that requires reversal.

However, defendants argue that the trial court did not err because plaintiff had her chance to present a pulmonologist in her case in chief, but instead made the tactical error of using only a cardiologist. We disagree. The best answer to defendants' "tactical error" claim is that the trial court, by denying defendants' motion for a directed verdict at the close of plaintiff's case, demonstrated that she had not erred in concluding that the testimony of Dr. Fintel, the cardiologist, would suffice to establish her *prima facie* case. Further, only *after* defendants had presented their evidence challenging Dr. Fintel's testimony did the need arise for plaintiff to rebut that testimony through Dr. Schoene. It would be a strange rule indeed that would require a plaintiff to present *all* conceivably relevant evidence in her case in chief—despite her preference not to do so—because she otherwise would be barred from presenting that evidence in rebuttal *in the event* defendants present evidence in their case in chief that plaintiff needs to (and can) rebut. Imposing such a "preemptive strike" rule upon plaintiffs would be counterproductive to the concerns expressed by the trial court in this very case. Such a rule would also be antithetical to the concerns expressed by all involved in our civil justice system about its present costs, wastes, and delays.

Using the present case as an example, assume defendants chose not to present competing expert witnesses and instead relied on deficiencies in Dr. Fintel's testimony and argued to the jury that plaintiff had simply failed to meet her burden of proof. If defendants were prepared to so choose, what sense could it make to *require* plaintiff to call Dr. Schoene in her case in chief or risk never being able to call him at all? Under these circumstances, the case would be unduly, unnecessarily, and expensively prolonged in obeisance to a rule that provides meaningful procedural protections to no one.

In so holding, we note that "the fact that the rebuttal evidence could have been introduced by the [plaintiff] in its case in chief will not render the evidence inadmissible in rebuttal." (*Williams*, 209 Ill. App. 3d at 723, 568 N.E.2d at 396-97.) Also, "[p]roper rebuttal evidence answers or contradicts affirmative matters raised by the defense in its case in chief." (*People v. Brown* (1992), 232 Ill. App. 3d 885, 900, 598 N.E.2d 948, 958.) In accordance with *Williams* and *Brown*, we add that evidence that would otherwise constitute proper rebuttal evidence is not rendered improper rebuttal evidence merely

because it conceivably could have been offered during plaintiff's case in chief. In so stating, we note that the present case is not one in which the plaintiff has purposely elected to save his best witness for rebuttal; accordingly, we need not address whether the trial court has discretion to bar such testimony. See *People v. Lucas* (1989), 132 Ill. 2d 399, 433-35, 548 N.E.2d 1003, 1017.

### III. ANALYSIS OF ISSUES ON REMAND

Although we have resolved this case based on the above two issues, plaintiff raises several more issues that will likely arise on remand. We address these issues separately.

### A. *Testimony of Dr. Patel as an Expert*

■ Plaintiff argues that the trial court erred by allowing Dr. Patel, a cardiologist, to testify as an expert for Dr. Zia. First, plaintiff argues that Dr. Patel could not testify as a Rule 220 expert because he was an occurrence witness and possibly a treating physician. This claim arises because Dr. Zia had scheduled Hoem to see Dr. Patel, but the appointment was for the day after Hoem died. Second, plaintiff argues that Dr. Zia's attorney contacted Dr. Patel *ex parte*, thereby violating the rule in *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952, which prohibits a party's unauthorized *ex parte* communication with a treating physician because such communication violates the doctor-patient relationship.

Regarding these arguments, Dr. Patel was neither an occurrence witness nor a treating physician because Hoem died before Dr. Patel ever personally saw Hoem, before he ever read Hoem's file, and even before he knew that Hoem held an appointment to see him. Plaintiff claims that *Davis v. Weiskopf* (1982), 108 Ill. App. 3d 505, 439 N.E.2d 60, and *Ritter v. Rush-Presbyterian-St. Luke's Medical Center* (1988), 177 Ill. App. 3d 313, 532 N.E.2d 327, support her argument, but we find those cases inapposite. In *Davis*, the court merely held that plaintiff *stated a cause of action* against a physician with whom the plaintiff held two appointments, the first of which defendant rescheduled and the second of which the plaintiff rescheduled. (*Davis*, 108 Ill. App. 3d at 506, 439 N.E.2d at 61.) Moreover, the pleadings in that case alleged that the defendant doctor had read plaintiff's file, knew of plaintiff's impending condition, but failed to warn plaintiff of it. (*Davis*, 108 Ill. App. 3d at 506-07, 439 N.E.2d at 61.) *Davis* thus differs substantially from the present case because the record here contains no showing that Dr. Patel knew anything about Hoem until after he died.

In *Ritter*, no question arose regarding the fact that the doctors had seen, examined, and treated the plaintiff. (See *Ritter*, 177 Ill. App. 3d at 316, 532 N.E.2d at 328.) Thus, *Ritter* does not establish that a doctor-patient relationship exists when a patient merely holds an appointment with a doctor who knows nothing about that patient until after the patient has died. Because Dr. Patel never saw Hoem or reviewed any of his medical records prior to Hoem's death, no doctor-patient relationship existed; thus, Dr. Patel could testify as an expert for defendants and no *Petrillo* violation occurred.

B. *Instructing the Jury That a Subsequent Party's Negligence Does Not Exonerate a Person for Previous Negligence*

■ Plaintiff next claims that the trial court ought to have instructed the jury that a subsequent party's negligence does not exonerate a person for previous negligence. Plaintiff's expert testified that had defendants referred Hoem to a cardiologist immediately, the cardiologist would have administered a course of treatment that would have prevented Hoem's death. Dr. Patel (the cardiologist Hoem would have seen) then testified that had defendants referred Hoem to him earlier, he would not have administered this course of treatment because, based on Hoem's medical records, he did not complain of angina. Plaintiff thus argues that had defendants referred Hoem to Patel, Patel then *would have* committed malpractice. Plaintiff argues that the jury might have thought that it should not hold defendants liable for failing to refer Hoem to a doctor who would have committed malpractice and allowed Hoem to die anyway.

In *Gertz v. Campbell* (1973), 55 Ill. 2d 84, 302 N.E.2d 40, the Illinois Supreme Court held that where someone is injured by two acts of negligence, the later, intervening act of negligence does not exonerate the person who committed the first act of negligence from liability. Plaintiff wants to extend this holding to *anticipated* intervening acts of negligence that never occurred. Further, plaintiff argues that the jury must receive instructions on this new rule. We need not address plaintiff's tenuous first argument because of our holding regarding her second.

Where no Illinois Pattern Jury Instruction (IPI) accurately states the applicable law, the trial court may instruct the jury with a non-IPI instruction tendered by either party. (*Daly v. Carmean* (1991), 210 Ill. App. 3d 19, 31-32, 568 N.E.2d 955, 963.) In the present case, plaintiff offered the following instructions:

"If a health care provider is guilty of professional negligence which results in a delay in the patient's referral for subsequent

medical treatment then the health care provider is liable, not only for any damages sustained by the plaintiff arising from that delay but also is liable for any damages sustained by the plaintiff which might have arisen form [sic] any care that might have been rendered by the subsequent health care providers to whom the plaintiff was referred." Plaintiff's Instruction No. 19.

"If you find that one or more of the defendants were negligent in failing to promptly refer the decedent to a specialist and that a reasonably well qualified specialist would have instituted measures for Richard Hoem designed to reduce the incidence of sudden death prior to his death then it is not a defense that the particular specialist to whom Richard Hoem was referred would not have done so." Plaintiff's Instruction No. 20.

Prior courts have *recommended* that the trial court instruct the jury on the *Gertz* rule, but plaintiff cites no case in which a trial court's failure to do so constituted an abuse of discretion. Indeed, in *Daly*, this court specifically stated that "[g]iving the instruction here would have been proper but the court did not breach its discretion in refusing the instruction." (*Daly*, 210 Ill. App. 3d at 32, 568 N.E.2d at 963.) Moreover, the tendered instruction in *Daly* was far less confusing and argumentative:

"'If a health care provider is guilty of professional negligence which čreates a condition of the plaintiff's body, then the health care provider is liable not only for plaintiff's damages resulting from that condition, but also liable for any damages sustained by the plaintiff arising from the efforts of subsequent health care providers to treat the condition caused by the initial health care provider.'" (*Daly*, 210 Ill. App. 3d at 30, 568 N.E.2d at 962.)

Not only does this instruction discuss *actual* subsequent negligent acts, it is also better drafted and therefore less confusing than plaintiff's proposed instructions in the present case. Thus, the trial court did not abuse its discretion by refusing to instruct the jury on the rule in *Gertz*.

### C. *Plaintiff's Summary Judgment Motion on the Issue of Whether Dr. Arnold Was an Agent of the Hospital*

■ Plaintiff next argues that the trial court erred in not granting summary judgment on the issue of whether Dr. Arnold was an agent of the hospital. The trial court did grant summary judgment for plaintiff regarding the agency relationship between Dr. Zia and the

hospital based on a contract between them, but denied the motion regarding Dr. Arnold. Essentially, plaintiff argues that the trial court erred because the evidence indicated that Dr. Arnold, who worked at Dr. Zia's clinic, was an agent of Dr. Zia and, to that extent, a subagent of the hospital.

A trial court should grant summary judgment only where no material issue of fact exists. (*Gardner v. Navistar International Transportation Corp.* (1991), 213 Ill. App. 3d 242, 246, 571 N.E.2d 1107, 1110.) On review, we must determine *de novo* whether the trial court correctly decided that a material issue of fact existed. *Wright v. St. John's Hospital of the Hospital Sisters of the Third Order of St. Francis* (1992), 229 Ill. App. 3d 680, 683, 593 N.E.2d 1070, 1072.

The contract between Dr. Zia and the hospital established their agency relationship. Dr. Arnold never signed such a contract, and thus an issue of material fact issue existed regarding whether Dr. Zia did, in fact, delegate work under his contract with the hospital to Dr. Arnold such that Dr. Arnold became the hospital's subagent. Accordingly, the trial court did not err by denying plaintiff's motion for summary judgment on this issue.

### D. *The Trial Court's Evidentiary Rulings*

Plaintiff next argues that the trial court erred in several of its evidentiary rulings. First, plaintiff argues that the court erroneously excluded evidence of hospital standards and medical treatises. Second, plaintiff argues that the trial court erred in allowing Dr. Buckingham and Dr. Sullivan to testify about stress testing because neither of them had ever administered a stress test. Finally, plaintiff argues that the trial court erred by excluding evidence that would have impeached Dr. Buckingham's impression of impartiality.

A trial court has sole discretion regarding evidentiary matters, and a court of review will not reverse the trial court's decision on an evidentiary matter absent a clear abuse of discretion. (*Baird v. Adeli* (1991), 214 Ill. App. 3d 47, 68, 573 N.E.2d 279, 292.) Based on the record in the present case, we do not find that the trial court abused its discretion regarding any of plaintiff's claims.

### 1. Medical Treatises and Hospital Standards

Regarding plaintiff's first argument, we recently held that medical treatises are inadmissible as substantive evidence in *Roach v. Springfield Clinic* (1991), 223 Ill. App. 3d 597, 585 N.E.2d 1070, *aff'd* (Dec. 4, 1992), No. 73394, slip op. at 13-18). Plaintiff argues that we should reconsider *Roach.* However, after oral argument in this case,

the Illinois Supreme Court upheld our analysis in *Roach*, and concluded that medical treatises should not be admissible as substantive evidence because they might undermine the hearsay rule and serve as a substitute for expert testimony regarding the specific case at hand. (*Roach*, No. 73394, slip op. at 15-16 (refusing to adopt Federal Rule of Evidence 803(18), which allows parties to admit medical treatises as evidence).) Thus, the trial court did not err in refusing to admit the medical treatises offered by plaintiff as substantive evidence.

 The hospital standards present a more difficult issue. In *Roach*, we held that evidence of hospital standards may be admissible to establish the applicable standard of care. (*Roach*, 223 Ill. App. 3d at 610, 585 N.E.2d at 1078, *aff'd* (1992), No. 73394, slip op. at 18.) In the present case, Dr. Zia helped prepare some of the hospital standards at issue. However, we are uncertain whether these standards related to standards for medical or nonmedical personnel. Dr. Zia testified that they are for "employees" who administer the cardiopulmonary stress test. Moreover, even if the hospital standards should not be excluded *per se* (*Roach*, 223 Ill. App. 3d at 610, 585 N.E.2d at 1078), they are also not *per se* admissible. The trial court apparently agreed with defendants' argument that the standards at issue here had little to do with the standard of care applicable to this case.

 Although not entirely clear from her brief, plaintiff seems to raise this issue regarding only two of her exhibits that the trial court rejected. The first exhibit—which Dr. Zia helped write—describes the pulmonary stress test that Hoem underwent and includes a paragraph on what the technician performing the test should do if the patient exhibits "adverse reactions" to the test. The trial court did not admit this exhibit for two reasons. First, plaintiff's case claimed negligence in failing to diagnose and treat Hoem's condition and did not claim negligence in administering the stress test. Second, the exhibit primarily pertained to what the *technician* (not the doctor) administering the test should do during (not after) the test. The trial court therefore held that the jury did not need a description of the goals and procedures employed in the stress test. We hold that this ruling did not constitute an abuse of discretion.

● 14 The second exhibit at issue is the Accreditation Manual for Hospitals (Manual), published in 1988 by the Joint Commission on Hospital Standards. Plaintiff offered it to bolster her claim that Dr. Arnold should have immediately prepared and reported the results of Hoem's stress test. Plaintiff offered—and the trial court admitted—other evidence that indicated that a doctor administering a stress test

should "promptly" prepare a formal report on the results of the test. In the glossary of the Manual, "prompt" is defined as "Performed immediately." Aside from the fact that this Manual seems more like a general, published medical treatise on hospital standards than a particular set of hospital standards that Decatur Memorial Hospital specifically adopted, we find little probative value in plaintiff's requested use of this exhibit. We therefore find no abuse of discretion.

## 2. Qualifications of Medical Experts Regarding Performing the Particular Procedures Involved

Second, plaintiff argues that because Dr. Buckingham and Dr. Sullivan had never administered a cardiopulmonary stress test, they were unqualified to testify about what the results of that test showed. In so arguing, plaintiff relies on *Northern Trust Co. v. Upjohn Co.* (1991), 213 Ill. App. 3d 390, 406-07, 572 N.E.2d 1030, 1040-41, for the proposition that a medical expert must have experience with the particular medical procedures at issue in order to render an opinion regarding the results of that procedure.

In *Northern Trust* (213 Ill. App. 3d at 406, 572 N.E.2d at 1040), this court identified a two-part test for determining the admissibility of expert medical testimony. First, the expert must be licensed in the same "school of medicine" as the defendant doctor. Second, the expert must be otherwise qualified to render expert testimony in the case. Although the expert in *Northern Trust* was licensed in the same "school of medicine" as the defendant doctor, he practiced only emergency medicine, while the defendant's alleged malpractice occurred in obstetrics and gynecology. The expert could only say that he had helped deliver babies " 'on occasion.' " He had never dealt with an interrupted pregnancy nor used the drug that defendant in that case had allegedly administered negligently. (*Northern Trust*, 213 Ill. App. 3d at 406-07, 572 N.E.2d at 1041.) We thus held that this expert could not establish the appropriate standard of care and any deviation therefrom because of the difference in experience and practice between the expert and the defendant doctor.

*Northern Trust* does not establish that an expert must have *extensive* experience with the particular procedures at issue before the court may properly permit the expert to testify. The expert in *Northern Trust* had absolutely no experience in the entire relevant field of practice, not to mention the particular procedures at issue. In the present case, Dr. Sullivan and Dr. Buckingham had considerable experience with pulmonary and cardiac problems from both an internist's and a pulmonologist's perspective.

Furthermore, plaintiff has not explained how or why any facets of the stress test would require the experts in this case to have had experience performing a stress test. Indeed, the stress test results in this case do not seem to differ significantly from ordinary EKG readouts, except that Hoem took the EKG while exercising instead of at rest. This case thus does not present a situation where the purported expert was unqualified to testify about the malpractice at issue. Absent some specifically articulated reason that experience performing the particular procedures at issue is necessary before a proffered expert can render a qualified opinion in the case at hand, that expert need not have performed all of the particular procedures involved in the case.

- In addition, as mentioned above, plaintiff did not claim negligence in administering the test, but instead claimed negligence in failing to see signs that purportedly signaled Hoem's impending fatal heart attack. The fact that Dr. Buckingham and Dr. Sullivan had not administered a stress test thus seems irrelevant to their ability to read the test results that—plaintiff claims—clearly showed signs to any qualified internist or pulmonologist that Hoem suffered from a serious heart condition that threatened to result in an impending and fatal heart attack.

Finally, both doctors admitted in front of the jury that they had not administered the tests. To the extent that this fact impeaches their credibility, the jury could consider it. However, it certainly does not rise to the level of disqualifying them. Thus, the trial court did not abuse its discretion in allowing Dr. Buckingham and Dr. Sullivan to testify as experts.

### 3. Impeachment on a Collateral Matter

■■■ Last, plaintiff points out that Dr. Buckingham testified that he had never taken a position in a malpractice case and later switched his position. Plaintiff then offered evidence that Dr. Buckingham had in fact changed his mind in the past—that in 1975, Dr. Buckingham rendered an opinion in a letter that a patient had a viable case of malpractice, and then, in 1982, he testified in the same case on behalf of the defendant hospital that no negligence occurred. Although this evidence did show that Dr. Buckingham had exaggerated by giving the impression that he had never changed his assessment of medical negligence, the trial court appropriately refused to allow plaintiff to impeach Dr. Buckingham on this matter. That Dr. Buckingham changed his mind in the seven years between opinions in another, completely unrelated case that occurred a decade earlier can—at best—constitute

impeachment on a totally collateral matter. Thus, the trial court did not err by barring plaintiff's efforts to impeach Dr. Buckingham on this matter.

### E. *Judgment Notwithstanding the Verdict*

■ In *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14, the Illinois Supreme Court held that a trial court should grant a judgment notwithstanding the verdict only if "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." Based on our review of the record in this case, we conclude that the evidence supports the jury's verdict under this standard. The trial court therefore did not err in denying plaintiff's motion for judgment notwithstanding the verdict.

### IV. CONCLUSION

For the reasons stated, we reverse and remand for a new trial consistent with the views expressed herein.

Reversed and remanded.

JUSTICE COOK, specially concurring:

I concur in the majority opinion except for its resolution of the Dead Man's Act issue.

Plaintiff's decedent had a conversation with Dr. Zia on October 31, 1988. Dr. Zia made notes of that conversation, and plaintiff introduced those notes at trial. Introduction of the notes constituted testimony "on behalf of the representative to [the] conversation with the deceased," as set out in the first exception to the Act (Ill. Rev. Stat. 1989, ch. 110, par. 8—201(a)), and the trial court then properly allowed Dr. Zia to testify to that conversation. Introduction of the notes is not much different from plaintiff's introduction of a deposition of Dr. Zia discussing the conversation, which would clearly waive the protection of the Act. (*Pink v. Dempsey* (1953), 350 Ill. App. 405, 113 N.E.2d 334; see also Ill. Rev. Stat. 1989, ch. 110, par. 8—201(b) (admission of decedent's deposition waives protection of Act).) The majority's overly technical argument that "an exhibit is not testimony" (239 Ill. App. 3d at 613) is refuted by the Act's third exception, that "[a]ny *testimony* competent under Section 8—401 of this Act, is not barred by this Section." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 110, par. 8—201(c).) Section 8—401 of the Act allows the admission

into evidence of "a book, record, or document of original entries." (Ill. Rev. Stat. 1989, ch. 110, par. 8—401.) Exhibits are testimony as that language is used in the Act.

The underlying basis for the majority opinion on this point may be the belief that Dr. Zia's trial testimony, so much at odds with his medical notes, is untruthful. Even if that were the case, the jury can adequately determine credibility by comparing the notes to the testimony. This is not a situation where an adverse party testifies to a conversation with a decedent about which the representative knows nothing. This is a situation where decedent's representative has evidence of the conversation and seeks to use that evidence. The policy of the Act is "not to disadvantage the living but rather to put the parties on an equal footing." M. Graham, Cleary & Graham's Handbook of Illinois Evidence §606.6, at 326 (5th ed. 1990).

JUSTICE LUND, concurring in part and dissenting in part:

I disagree with the implication of the majority opinion that a standard-of-care expert who could have been called by plaintiff in the case in chief, except for late disclosure under Rule 220, can *always* testify as to the standard-of-care issue on rebuttal. The suggestion belittles the reasons for Rule 220. My esteemed colleague suggests Rule 220 plays no role in the assessment of the correctness of the trial court's limitations of Dr. Schoene's testimony on rebuttal. I believe otherwise.

Prior to trial, defendant's motion for summary judgment placed plaintiff on notice that testimony of her expert as to standard of care, Dr. Fintel, would be attacked upon the theory that pulmonologists, not cardiologists, know the proper standard. Obviously, because of this warning, plaintiff obtained Dr. Schoene, a pulmonologist, for purposes of testifying as to the standard of care and backing up Dr. Fintel's opinion. The trial court, based upon Rule 220, held disclosure of Schoene untimely and prohibited his use.

After defense experts, known to plaintiffs well before trial, presented testimony questioning Dr. Fintel's ability to state the standard of care of a pulmonologist, Dr. Schoene was called as a rebuttal witness to contradict defense experts. As stated in the majority opinion, Schoene's testimony was restricted. I find no fault with the restrictions.

The reasons for Rule 220 are set forth in an article published in the July 1986 Illinois Bar Journal. The article was authored by Judge Lester D. Foreman and attorney David B. Mueller, cochairman of the

Illinois Supreme Court *ad hoc* committee on discovery. The article contained the following statement:

> "At times, an expert's late or surprise testimony was permitted, even if the opponent was prejudiced. At other times, opinions were barred, to the detriment of the proponent. Trials were delayed. Often the allowance or disallowance of the testimony resulted in reversible error necessitating retrial.
>
> Supreme Court Rule 220 is an attempt to eliminate (or avoid to the greatest extent possible) the foregoing evils, while at the same time retaining the flexibility essential to the exercise of judicial discretion. In short, it gives the judge some guidance, while allowing trial counsel to rely upon its provisions as a means of eliminating the type of 'surprise' which previously frustrated the process of pretrial preparation and evaluation." Foreman & Mueller, *Timely Disclosure of Expert Witnesses—Analysis of Supreme Court Rule 220*, 74 Ill. B.J. 540, 540-41 (1986).

Attorney Charles Redden wrote an article published in the September 1992 Illinois Bar Journal, which contained the following statement:

> "Where the courts recognize abuses, they rarely impose the sanction provided by Rule 220. As a result, even the diligent and well-prepared trial attorney seldom knows with any certainty who will be called as an expert or what he or she will say.
>
> Rule 220 explicitly mandates the certainty that the courts of review refuse to provide. The simple and precise definition of an expert avoids numerous exceptions. Rule 220 details, under clear and mandatory guidelines, the timing of disclosure of experts and their opinions and demands complete and updated discovery responses so that, at trial, nothing new or inconsistent may be heard." Redden, *The Decline of Rule 220: The Rise of Trial by Ambush*, 80 Ill. B.J. 440, 441 (1992).

Prior to the adoption of Rule 220, it had long been generally accepted that where testimony which might properly have been introduced as proof in chief was offered in rebuttal, admissibility was discretionary with the trial court. (*People v. Bell* (1927), 328 Ill. 446, 451, 159 N.E. 807, 809; *First National Bank v. Lake Erie & Western R.R. Co.* (1898), 174 Ill. 36, 44-45, 50 N.E. 1023, 1026; *City of Sandwich v. Dolan* (1892), 141 Ill. 430, 441, 31 N.E. 416, 419; see also *People v. Crump* (1955), 5 Ill. 2d 251, 265-66, 125 N.E.2d 615, 623.) I see no reason to abandon this case law.

Rule 220 must be enforced so that nothing new or inconsistent pops up at trial to hamper the orderly pursuit of justice. Perhaps the policies underlying Rule 220 would have best been served by allowing Dr. Schoene to testify in plaintiff's case in chief. On retrial, I see no reason why plaintiff could not then use the doctor in that part of her case. Defendants have, and will have, ample time to complete discovery relating to the doctor. The policy of Rule 220 will not be thwarted. However, I believe Rule 220 is best served by now affirming the decision of the trial court in limiting the examination of Dr. Schoene during rebuttal. Any other decision sends out a message suggesting it is possible to avoid Rule 220 disclosure by withholding an expert witness until rebuttal.